McINNIS, Judge.
This is a suit by a water well drilling contractor for what he claims is the balance due for drilling a water well for the Northeast Louisiana Pentacostal Camp Association, hereafter referred to for brevity as the Association. Payment was guaranteed by Rev. R. V. Manuel and S. T. Holland, and they have been made defendants along with the Association.. The contract for drilling the well is in writing and reads as follows:
“We, N. E. La. Pente. Assc., hereby agree to contract for the drilling of a .water well on the camp grounds for the consideration of $4.00 per foot, all material furnished. The specifications .of . material will be as follows: 4" heavy black pipe. for casing, 4" bronze screen 10' long, and other materials necessary. In the event of a dry hole or water not obtained, the cost will be $1.00 per ■ foot. The contractor will not furnish the pump which will' be furnished by the Camp. Asscn.
“R. :V-. Manuel, Secretary & Treasurer
“O. Robichaux,. Contractor.
“We guarantee that the N -E- La 'Pent Camp-Asscn will pay this bill, by August ist 1950. '
“Rev. R. V. Manuel
“S. T. Holland”
Plaintiff drilled a well 220 feet deep, and has been paid $213.51. This suit is for the sum of $666.49, claimed by plaintiff to be due.
Defendants answered, denying that they owed $4 per foot for -drilling the well because, they say, it did- not produce water. They tendered - $6.49 which was refused, and this sum was deposited in the Registry of the Court.
After trial on the merits there was judgment for the plaintiff for $220, less $213.-51, previously paid, and while not specifically prayed for, the district judge, under plaintiff’s prayer for equitable and general relief, entered judgment permitting plaintiff to remove the casing in the well, and allowing 60 days from the date the judgment becomes final to remove it. From this judgment plaintiff perfected a devolutive appeal to this court. '
: Plaintiff claims that the well produced ample water, for the needs of the Association, -but also claims that in any event it is not a dry hole, and that it does produce some water, and that the contract should be construed to mean that if any water at all was produced, then he is entitled to the full contract price of $4 per foot.
Defendants contend that the clause of the contract referring to production of water should be construed in the light of the object of the contract and the intention of the parties, and although the well did provide' small quantities of water, it should be deemed a dry hole.
Under the-terms-of the guaranty the well was to-be paid, for on August 1, 1950. This *566 suit was filed August 4, 1950. After a series of fixings and refixings of the case for trial, it was finally taken up for trial March 5, 1951. After plaintiff had testified, all parties agreed that the trial be suspended in order that tests of the well might be made in the presence of the judge, and the judge made three visits to the well to watch tests being made, and finally the case was taken up for trial on June 7, 1951, but plaintiff’s counsel became ill, and the case was continued without fixing. Finally the trial was completed on November 20, 1952, and judgment rendered May 18, 1953.
The drilling of the well was commenced July 9, 1950, and was completed about July 19, 1950, on which date Mr. Fred Henslee commenced a series of -tests of the well, using a pump that he proposed to sell the Association. He was more interested in demonstrating the capacity of the pump to lift the water than he was in testing the capacity of the well to produce water. He kept a log of the three tests he made. This log shows the following:
“Well data: Depth Approx. 190 ft.
Fluid level, Standing near surface.
Performance: ist test-time 4 hrs. 30 min.
Rate per min. 3.12 GPM.
Fluid condition — Muddy—Well giving up small amount sand. Shut well down to make rod adjustment.
2nd. test — Time 6 hrs. 20 min. rate per min. 2.97 GPM. Fluid condition — Water clearing up — Still giving up sand. Shut well down and washed out sand.
,3rd test — time 5 hrs. Rate per min. 3.05 GPM. Fluid condition — muddy—clearing after about one hour.
Remarks: Pump performed within 5% of actual guarantee based on efficiency chart.”
Mr. Henslee admits that during the tests fie ran (two on July 19th and one on July 20th), some water was put back into the well. Other witnesses for both plaintiff and defendants say that water was put into the well, between the casing and the tubing. For some ten days after the tests by Mr. Henslee, plaintiff continued to work on the well, during which time some water was put into the well. Plaintiff was trying to sell defendants on the idea that the well was producing sufficient water for their needs, but in this he was not successful, and he took the tubing from the well and disconnected the pump. It appears that there was some dispute as to whether plaintiff or the Association should pay for the tubing in the well, and that is the reason plaintiff took the tubing out, and disconnected the pump. A strict interpretation of the contract would place the cost of the tubing on plaintiff.
The judge visited the well at three different times. The first test gave a small amount of water. Plaintiff contended that the well having been shut down for some eight or ten months had caused it to sand up, and better results could be had by washing and blowing the well with air, so the judge left and returned later for two other tests. On each occasion the water that had accumulated in the well was pumped out and it was then pumped for an hour. The amount of water produced on each of the three tests varied from three to seven gallons per hour. As a result of these tests, and from the evidence that water was put in the well during Mr. Henslee’s tests, the lower court concluded that the producing capacity of the well is from three to seven gallons of water per hour, and he concluded that this amount is not sufficient to reasonably serve any substantial human need. We agree with this conclusion.
But plaintiff says that if any water at all was produced the well cannot be classified as a dry hole, and in support of this contention cites Delaune v. Gambino, La.App., 161 So. 331, 332. The written contract of the parties in the cited case is somewhat similar to the contract in the instant case, and the concluding paragraph reads: “It is further guaranteed that when well is completed that water is guaranteed, or no pay will be called for.”
Gambino was engaged in the dairy business, having a herd of 100 to 125 cows, and it was to supply water for these cows that he had the well drilled. Delaune sank a well to a depth of 515 feet, but in a short time it commenced to pump sand. Delaune *567 theft returned and installed a new strainer of finer mesh, in an effort to correct the trouble, but without success. He then sank another well some distance from the first well, and Gambino refused payment solely on the ground that the well did not produce sufficient water for his purpose. Gam-bino admitted however, on trial of the case that the well produced enough water for his purpose, provided the pump was operated for a sufficient length of time. He said that in the spring the pump had to be operated from six to eight hours per day and in summer when the weather was hot and dry the pump had to be operated from eight to twelve hours a day. The Court of Appeal, reversing the judgment of the lower court, which rejected the demand of plaintiff, said:
“He [plaintiff] sank the first well to a depth of SIS feet, and, although this well did produce water, he was not satisfied with the result, and conscientiously sank the second well to a somewhat greater depth. There could be no doubt of his good faith in the matter. Defendant was guaranteed á well that produced water. He received a well that did produce water and that produced enough water for his purpose if the pump was operated a sufficient number of hours per day.” See also Weldon v. Crooks, La.App., 24 So.2d 479.
Plaintiff in the instant case contends that when completed the well produced the average of three gallons a minute, according to tests by Mr. Henslee and that allowing the well to set idle so long caused it to sand up so that it would produce only three to seven gallons an hour. We are not convinced that Mr. Henslee’s tests are proof of the production of the well. His testimony does not support such a conclusion. There is no doubt some water was put in the well during these tests. How much is not shown by the record, however plaintiff continued tests in his effort to convince defendants that it was a good well, which he was never able to do.
' The contention that a well producing from three to seven gallons of water an hour is compliance with the contract is untenable. Such a well would hardly supply a small family if the pump were operated around the clock.
For the foregoing reasons the judgment of the lower court is affirmed.