McBRIDE, Judge.
Plaintiff, Sidney T. Davilla, then aged 57 years, was admitted to the Ochsner Foundation Hospital, Metairie, Parish of Jefferson, August 5, 1947, and on August 7 submitted to an operation for diaphragmatic herniation, performed by Dr. Alton Och-sner. The wound resulting from said operation eviscerated (the stitches broke), and the physicians in the early morning hours of August 19 re-sutured the wound. In all, plaintiff remained in the hospital until September 5, 1947.
Davilla brought this suit on August 6, 1948, claiming of defendants (who are alleged to be the owners and operators of the hospital and their liability insurer), in soli-do, the sum of $30,000 as damages, charging that some person or persons in the employ of the hospital during his stay therein following the operation placed a tourniquet on his arm in connection with the introduction into his vein of a needle for an infusion, or some similar medical purpose, and negligently permitted such tourniquet to remain on his arm for an extended period of time. He alleges that the fact that the tourniquet was allowed to remain on his arm caused serious injuries, viz., a right axillary neuritis with deltoid muscle atrophy.
The petition sets forth no specific date the tourniquet was applied. Defendants initially interposed an exception of vagueness which, however, was never tried, and we were informed during the argument of the case that the exception was abandoned by the pleaders because the attorneys for plaintiff furnished defense counsel with the information that the alleged incident occurred “on or about the 17th of August, 1947.”
Defendants answered the suit October 13, 1955, generally denying negligence or liability, but the case was not tried in the court below until November 21, 1956, or more than eight years after the petition was filed.
The trial judge held in favor of defendants and dismissed the suit handing down brief reasons, the gravamen of which is that he thought plaintiff had failed to prove his case by a preponderance of evidence. Plaintiff has appealed.
The focal point in the case is one of fact. Did any employee of the hospital negligently apply a tourniquet to plaintiff’s right arm from which plaintiff suffered damages?
At the outset we notice that the date the tourniquet is alleged to have been negligently left on plaintiff’s arm was never shown convincingly or with any degree of certainty. After the exception of vagueness was filed, defendants’ counsel were informed that the incident took place on or about August 17, 1947. During direct examination plaintiff testified that the accident happened about twenty-four hours after the evisceration of the wound was re-sutured, and that the nurse applied the tourniquet about 6:30 p. m. This would place the alleged incident as having occurred on August 21. However, in the course of cross-examination plaintiff was vague in fixing the date mentioning that the incident could have happened on August 17, 18, or 19. It appears that during January 1948 plaintiff consulted Dr. Benjamin F. Morton of Birmingham, Alabama, and in a report sent by this physician to him, the history of plaintiff’s complaint as given by him to the physician is stated thus: “According to the information obtained, you had an operation for a diaphragmatic hernia August, 1947. The day following the operation at about 6:30 p. m., a rubber tourniquet was applied to the right arm.” This statement of plaintiff which Dr. Morton attributes to him would identify the date as August 8. The record also discloses that plaintiff told Dr. J. A. Colclough, who appeared as his only medical expert at the trial, that the tourniquet was applied the day after the operation — in other words, on August 8. Mrs. Davilla testified she *287 arrived at the hospital at 11 o’clock a. m. on the morning after the second operation, i. e., the re-suturing of the eviscerated wound, and that plaintiff’s right arm was swollen twice its size and was badly discolored. According to her testimony the incident occurred on August 20.
■ Plaintiff is a resident of Birmingham, Alabama, and after his hospitalization returned to that city. On January 5, 1948, he consulted Dr. Morton, above-mentioned, and thereafter on the same day plaintiff addressed a letter to Ochsner Clinic reading as follows:
“Since my operation and, particularly, since my arrival home, I have had a definite numb feeling in my right arm and shoulder, which was occasioned by, and your Nurses and Orderlies will verify this, a Tourniquet left on my right arm unnecessarily; indeed, for several hours, when the needle for the hose containing blood and vitimized water was inserted in my arm. This incident caused my arm to swell to twice the normal size and, in fact, the arm turned blue. Your Nurse, immediately, brought in Hot Water Bottles, etc. in an effort to help the situation. However, today, realizing that this numb, limp feeling in my right arm was growing worse, I immediately consulted a Nerve Specialist here who advised that the Axilary nerve was dead, because of this afore-said Tourniquet, remaining indefinitely on my arm, there.
“The above for your information.”
The above-quoted letter, by the admission of plaintiff, was the first notice of any kind he gave to the hospital that he was claiming an injury had been sustained during the tenure of his stay there, and it must be noted that the letter was not written until exactly four months had expired from the time of his discharge from the institution.
From the witness stand plaintiff maintained the tourniquet was placed on his arm by a nurse named “Miss Altomat,” and his recital of the incident appears from his testimony as follows:
“ * * * Well, then they put the tourniquet on my arm. They did that on several occasions, but on this particular occasion, that caused this accident, the nurse covered me up, and I went to sleep, and when I awoke I was in excruciating pain, and my arm was at least twice its normal size. But I didn’t get excited. I figured that the swelling would go down. They rushed in with hot water bottles and every other device, and I guess that led me to believe it would be all right, and then later on I noticed a recession of the muscles in my shoulder in the flesh, and the flesh left the bone there, and today I have nothing but a kind of bone in my shoulder, because that tourniquet was forgotten about on my arm. They took the tourniquet off, and they rushed in and out with hot water bottles.”
Plaintiff sought corroboration for his statements by producing a witness named Gene Moore who identified himself as a one-time orderly in the employ of the hospital and testified:
“I was walking down the corridor, and I looked in at Mr. Davilla, and he was asleep, and he had an infusion in his arm, and the bottle was empty, and his arm was swollen up about double the size of the arm, up here (indicating), and I walked in, and I said, ‘Oh, oh, it looks like they done messed up’, in a joking manner, and I rushed out and called the nurse, and she came down, and she was all excited, and she removed the tourniquet, and she told me to go get some hot water bottles, and I went and got some hot water bottles, and applied them to his arm.”
Much significance must be given Moore’s statement that plaintiff had an infusion in his arm and the bottle was empty, for this will come in for some discussion later. Special mention should also be made that *288 on cross-examination Moore contradicted his statement that “she,” meaning the nurse, “removed the tourniquet” by admitting that he did not see any tourniquet on plaintiff’s arm but “found out about that later.” Moore’s testimony also is in disaccord with what plaintiff said with respect to the time element. Moore states it was between 6 :00 and 9:00 p. m., while the plaintiff fixes 10 45 p. m. as the time when the excitement occurred. It is also noteworthy that from Moore’s statements appears an odd circumstance and that is that no one talked to him about the incident until “about five years ago” (i. e. about four years after the accident or about the latter part of 1951) when plaintiff requested him to go see plaintiff’s lawyer. Moore insisted he remembered plaintiff and had a clear recollection of the incident in the hospital which he says took place in 1947.
Mrs. Catherine Winstein, who stated she is plaintiff’s stepdaughter, also appeared as a witness, but was unable to specify any date with reference to the tourniquet incident, and the import of her testimony is that on one occasion when she visited plaintiff his right arm was “horribly swollen and badly discolored” and that he was complaining of pain.
Dr. Colclough, plaintiff’s medical expert, examined him twice, first on November 5, 1956, and subsequently on November 20, 1956, the latter date being the day which preceded the trial. Dr. Colclough testified at length as to his findings with reference to plaintiff’s present physical condition. Of course he frankly admitted having no personal knowledge as to what might be attributed the impairment he found in plaintiff’s right arm as he did not see plaintiff or conduct his examinations until more than nine years after the alleged incident under investigation. Dr. Colclough made the further admission that a number of other causes could conceivably be responsible for injuries similar to those claimed by plaintiff.
Before discussing the testimony adduced by the defense it would be proper to point out what not only appear to be, but are, glaring inconsistencies in the testimony of plaintiff and his lay* witnesses regarding the condition of his arm during his stay in the hospital and at the time of his discharge therefrom.
Plaintiff declares the arm turned black and blue and became swollen almost twice its normal size, which conditions persisted even for a period after he left the hospital, and that he endured severe pain. He stated a month passed before the swelling began to recede, and it was then the flesh began to “move” and the muscles deteriorate. His wife’s testimony is in sharp contrast to this, and her declaration is that the swelling was “very noticeable” for about five days and then it began to go down gradually. She characterized the arm as being “just slightly” swollen and “slightly discolored” at the time of her husband’s medical discharge. Moore, the orderly, testified he saw plaintiff’s arm several times after the accident and it was swollen and discolored. Mrs. Winstein would not say the arm was “double its size,” and she could not remember plaintiff’s condition when he took leave of the hospital.
There is a circumstance present to which the court must attach special significance in adjudicating upon plaintiff’s demands and we now turn our attention thereto. Throughout the time plaintiff was a patient in the hospital the nurses and staff physicians visited him often observing his condition and inquiring as to his well-being. Dr. Ochsner himself and also a staff member, Dr. DeCamp, made daily visits to plaintiff’s bedside. Both physicians remember plaintiff well. They say that at no time did he make any sort of complaint about leaving of the tourniquet on his arm nor did he report that anything unusual had happened. Their attention was not called to any swelling or discoloration of the arm, and although their purpose was to observe the condition of the patient on their numerous visits, they noticed no unusual condition such as the swelling or discoloration plaintiff claims existed. Plaintiff concedes he *289 made no verbal complaint to anyone connected with the hospital at any time, and that the one and only notice he gave was the letter sent from Birmingham four months after the physicians discharged him. We can only remark that if an accident such as plaintiff described had in truth and in fact occurred, his inaction and silence would stamp him as a most unusual individual. To magnify the odd conduct on the part of plaintiff, there is a showing in the record that subsequent to the re-suturing of the wound he complained of phlebitis in an ankle, and that he later underwent an operative process for correction of a condition which existed in the prostate gland. Surely if the patient’s arm was as badly swollen and discolored as he pretends it was, the physicians could not have failed to notice these conditions, especially when he was taken into the operating room for the surgical procedure.
Dr. .Paul DeCamp, the staff member already referred to, made a final examination in connection with plaintiff’s discharge, and he states that plaintiff never alluded to any difficulty with the arm nor did Dr. DeCamp find anything wrong with the member during the course of the examination.
Moreover, plaintiff’s course of conduct appears all the more strange when a series of letters he wrote to the hospital are taken into consideration. After he returned to Birmingham, he was having a controversy with Ochsner Clinic and it was his impression that the hospital had overcharged him both with reference to the hospitalization and the fee of Dr. Ochsner. He sought an itemized statement setting forth the various charges. It would appear that he desired to make arrangements to pay whatever balance he owed by making installment payments over a period of time. Accordingly, he addressed letters to the hospital dated October 23, November 27, December 7 and December 15, 1947, and in none of the four letters did he say that he had been the victim of the accident or a nurse’s .carelessness or that his arm was troubling him. In the letter of November 27 he made the assertion that he had not been able to work for three and one-half months which fact he attributed to the phebitis which he said still persisted.
It would not be unreasonable to suppose that had the arm been injured in the hospital plaintiff would have said so, and human nature being what it is, we believe plaintiff would not have missed the opportunity of urging any claim he may have had in tort against the hospital in offset to the bill which the hospital was calling on him to pay.
There is considerable expert testimony regarding where a tourniquet should be positioned in connection with an infusion to be introduced into the bend of a patient’s elbow. Moore said he saw the nurse remove the needle from the bend in plaintiff’s elbow after he summoned her to the scene. There is unanimity in the opinions of the medical witnesses that the tourniquet for such an infusion would be placed just above that point and not high up on the arm. The physicians are also in complete accord that if the tourniquet would be allowed to remain for an extended length of time, any damage caused thereby would be incurred below the site of the tourniquet and not above it. We gather from the testimony that it would be most unusual in medical practice to apply a tourniquet high on the arm when the vein at the elbow bend is to be entered.
Plaintiff maintains the tourniquet was placed four inches below the armpit. There was also a discussion by the physicians as to what nerves would be damaged had a tourniquet which had been applied in that position been allowed to stay on the patient’s arm for a period long enough to cause injuries. We can say, without going into details, that the weight of the testimony is to the effect that the axillary nerve, which plaintiff claims is injured, could not be affected.
Counsel for plaintiff state in their brief that the defendants admit it is possible that a tourniquet placed' high on the arm, as *290 plaintiff described it, could cause the injury complained of. We think the basis for that contention is a bit of Dr. Ochsner’s testimony taken and considered out of context. We cannot find anywhere in the record that such an admission was made by defendants. Dr. Ochsner’s testimony bearing on the point in question fully quoted is as follows:
“Q. Dr. Ochsner, on direct examination Mr. Adams named several nerves, and asked you if it would be possible to apply a tourniquet high enough to injure the nerves he mentioned, and I believe your answer was that it could not, is that right?
“A. I said I thought it would be impossible to apply the tourniquet high enough to affect the axillary nerve, the suprascapular nerve, the long thoracic nerve and the thoracodorsal nerve.
“Q. But couldn’t it injure those particular nerves if the tourniquet was applied where Mr. Davilla said it was applied on him?
“A. I doubt that it could. I doubt that. I don’t believe it would be possible to put a tourniquet on high enough to do that.
“Q. Let’s asstvme that it could be done?
“A. Well, one nerve that it might involve would be the axillary, but I don’t believe that it would.” (Italics ours.)
But be that as it may, even if it be true, as plaintiff contends, that a tourniquet was applied in connection with an infusion and left on the arm, the contents of the bottle could not have entered into the vein. Dr. Ochsner’s uncontradicted testimony on that point makes this clear. He said:
“* * * We put the tourniquet on to introduce the infusion into the vein, and if the tourniquet was left on, it would be impossible for any of the infusion to get in.”
Defendants produced as evidence a copy of plaintiff’s hospital chart, and the argument is advanced that the chart would attest the fact that no accident befell plaintiff while a patient in the hospital. The chart in question contains no notation of an instance such as the one upon which plaintiff bases his claim. This is negative evidence it is true, but we believe it has some cumulative value.
We notice the plaintiff’s hospital chart does not contain a listing of the nurses who were on duty in Division 7 during the time plaintiff was a patient therein. Both plaintiff and the orderly, Moore named Miss Altomat as the nurse on duty who made application of the tourniquet. Dr. Ochsner remembered this nurse but said she had not been connected with the hospital for a number of years. Plaintiff’s counsel argue that defendants were under the duty of producing Miss Altomat and that their failure to do so gives rise to an inference that her testimony would have been detrimental to defendants’ position. Of course, there is a rule of evidence to the effect that the failure of a litigant to produce a material witness under certain circumstances may give rise to such an inference, but we do not believe there is room in this case to apply the doctrine.
Defendants only learned of Miss Altomat at the trial of the case which, as we have said, took place more than nine years after the alleged incident, and at that time she was no longer connected with the hospital having departed some years previously. Neither in his letter of January 1948 nor in his petition did plaintiff mention the nurse’s name, and even if the hospital record had contained the names of the nurses on duty, still it would have been most difficult for defendants to identify the nurse involved in the alleged incident because of the vague and uncertain allegation of the date on which the incident is supposed to have taken place.
Because of such vagueness and uncertainty in the date, defendants were placed *291 in a decidedly disadvantageous position. However, it must be said to their credit that they did make some attempt to ascertain who the nurse could be. A Mrs. Johns and a Mrs. Fairchild, private nurses, were subpoenaed as defense witnesses, and they testified they were on duty on the day following plaintiff’s original operation and that the incident upon which the suit is based did not occur while they were there.
Plaintiff’s assertion that a tourniquet had been placed on his arm stands alone without corroboration from any source whatsoever. His chief witness, Moore, first said he saw the nurse remove the tourniquet, but under cross-examination admitted he did not see a tourniquet and only learned about it afterward, so his testimony must be disregarded as worthless, and, to say the least, most suspicious. Mrs. Davil-la says she observed a rubber tourniquet on the floor the following morning, but she could not say that it had ever been on her husband’s arm. Her testimony can lend no support whatever to plaintiff’s claim for it proves nothing of any material value.
Dr. Morton, the physician who examined plaintiff in Birmingham in January 1948, refused to come to New Orleans as a witness for plaintiff and also declined to give his depositions in the case. Dr. Col-clough could not say that plaintiff’s damaged physical condition resulted from the application of a tourniquet, and he specifically pointed out that the injuries could have resulted from other causes some of which he enumerated. One of them is a violent stretching which would tend to separate the distance between the head and shoulders. Another is a tourniquet. Lying on the shoulder in an improper position for a prolonged period of time could have caused the damage. Certain wounds could have been the cause. Malaria fever and lead poisoning were also mentioned as possible causes.
In such a case as we have before us where the plaintiff’s testimony is unsupported and there is no positive evidence to contradict his story, the court should carefully scrutinize the testimony and study in detail what the plaintiff said and what circumstances the record might contain which might have a tendency to disprove his statements.
Wigmore in his work on Evidence, 2d Ed., Vol. 4, § 2034, p. 309, says:
“ * * * the mere assertion of any witness does not of itself need to be believed, even though he is unim-peached in any manner; because to require such belief would be to give a quantitative and impersonal measure to testimony.”
In Franklin v. Texas & P. R. Co., La.App., 35 So.2d 251, 252, we said:
“If the unsupported statement of a plaintiff in this kind of case is to be accepted, regardless of the circumstantial evidence and regardless of whether or not plaintiff’s character is such as to entitle him to be believed, then in any case in which a plaintiff is injured where there is no positive evidence to contradict his story, recovery must be allowed regardless of all suspicious surrounding circumstances.”
See also McIntire v. McBeath, La.App., 57 So.2d 707; Robichaux v. Northeast Louisiana Pentecostal Camp Ass’n, La.App., 69 So.2d 564; Ladmirault v. Bisso Ferry Co., La.App., 72 So.2d 8.
As hereinabove pointed out, there are certain circumstances and discrepancies which in themselves cast doubt upon plaintiff’s veracity, the most glaring of which is the failure to make complaint to the physicians in the hospital of his injuries, or to give timely notice thereof after he left the institution. Plaintiff was also uncertain of and vacillated with reference to the date on which the accident is supposed to have occurred. Furthermore, he did not disclose the name of the offending nurse until he took the witness stand at the trial of the case. Besides this, there are competent medical opinions which ren *292 der the facts testified to by plaintiff improbable. The court below was unwilling to accept plaintiff’s statements and we are of the same mind. He should not be entitled to recover on the basis of his own testimony which, to put it mildly, is most unsatisfactory. We agree that plaintiff has failed to prove his case by a preponderance of the evidence.
Therefore, the judgment appealed from is affirmed.
Affirmed.